

# NUMBER 13-11-00523-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **JUSTIN RHYS SCEPANSKI,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Perkes, and Longoria
### Memorandum Opinion by Justice Perkes

Appellant Justin Rhys Scepanski appeals his conviction of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West, Westlaw through 2013 3d C.S.). Appellant pleaded not guilty to the indicted offense of capital murder in the course of robbery, but a jury found him guilty of the lesser-included offense of murder and assessed

punishment at forty-five years' imprisonment in the Texas Department of Criminal Justice, Institutional Division. By five issues, appellant argues: (1) he was entitled to lesser-included instructions on manslaughter and criminally negligent homicide; (2) the trial court should have disallowed the testimony of untimely-designated witnesses; (3) the trial court improperly admitted extraneous-act evidence during the punishment hearing; (4) the State's punishment-hearing argument was improper; and (5) the trial court improperly omitted an extraneous-act instruction in the punishment jury charge. Because we hold appellant was entitled to a lesser-included instruction on manslaughter, we reverse and remand.

## I. BACKGROUND

Baldemar Villarreal was shot once in the upper abdomen from close range. He was outside his house, and it was nighttime. Inside his house, his wife[1] Kristina Guerra heard the gunshot followed by the sound of "a vehicle peeling out." Guerra went outside, where she saw her husband stumbling toward the house. He told her to call the police because he had been shot. Guerra immediately called the police.

Guerra returned to Villarreal after calling the police. Villarreal asked Guerra to retrieve his nine-millimeter handgun, which was laying "by the street" near the front gate to Villarreal's property. Guerra retrieved the gun, took it inside the house, placed it in a gun case, and put the gun case in a bedroom closet.

---

[1] At trial, most witnesses referred to Guerra as Villarreal's wife, and Guerra herself stated Villarreal was her husband. Elsewhere in the record, however, she was identified as Villarreal's girlfriend, and the State said she was Villarreal's common-law wife in its opening argument.

The police officers arrived and found a nine-millimeter shell casing and Villarreal's cellular telephone on the road near the front gate to Villarreal's property. Villarreal lay recumbent near the staircase leading to the front door of Villarreal's house. The responding officers observed a "stack" of currency lying near the stairs.

Deputy Jose Contreras was one of the first officers to arrive. Deputy Contreras talked to Villarreal, who told Deputy Contreras what happened: "[Villarreal] told me [Deputy Contreras] that his friend Justin had called him and wanted to hang out with him. So he went outside—he went outside and Justin had arrived, that Justin had grabbed him by the neck and then shot him the stomach area." Deputy Contreras testified that Villarreal explained he had been shot "on the roadway" by a passenger of "like a black Jimmy" who grabbed Villarreal by the neck and demanded, "[G]ive me your money." According to Deputy Contreras, Villarreal "kept telling me, 'It was Justin. It's Justin[.]'"

Sergeant Miguel Davila of the Hidalgo County Sheriff's Office also talked to Villarreal, and Sergeant Davila's recollection of what Villarreal said closely paralleled Deputy Conteras's testimony:

> He [Villarreal] stated he had gotten a phone call from a friend named Justin, that he was in the front of the—his property by the roadway and for him to go over there. He walked over there. He sees Justin and he's a passenger to—he—as he said, a dark colored SUV, like a Jimmy, I believe he said. He says he was a passenger. When he walked up to him, I guess Justin told him—he goes, ["]Give me all your money["], and he took a shot at him.

Deputy Julio Castenada also testified Villarreal "said a man by the name of Justin shot him." Guerra confirmed Villarreal received a phone call and went outside his house about five minutes before he was shot, and Guerra testified Villarreal told her also that a

man named Justin shot him from the passenger side of a dark colored vehicle. Guerra said she had never heard of appellant before then. Villarreal died later, and forensic pathologist Norma Jean Farley testified that the gunshot wound to the upper abdomen caused his death.

Pursuant to Guerra's consent, responding officers searched Villarreal's house. Deputy Castenada found the gun case in the bedroom closet and seized the nine-millimeter handgun from the case. Before removing the gun from the premises, Deputy Castenada "cleared" the weapon, meaning he removed the handgun's magazine and the cartridge he found "chambered," which Deputy Castenada defined as a gun with a cartridge that has been transferred from a handgun's magazine to the gun's barrel— "ready to be fired."[2] Deputy Castenada affirmed that one chambers a cartridge by cocking the firearm.[3] Guerra testified that when she retrieved the gun from the street and placed it in the gun case, she did not chamber it.

On the day after the shooting, lead investigator Leonor Garcia, who understood that the primary suspect was named Justin, dialed phone numbers another officer retrieved from Villarreal's cell phone. A man named Justin answered one of the calls, and when Investigator Garcia asked, "What Justin[?]," the man responded, "Justin

---

[2] Edward Wallace, a forensic scientist supervisor in the firearms section of the Bexar County criminal investigation laboratory, explained in more detail:

> Chambering a cartridge or a bullet is when you place an unfired round of ammunition into the chamber of the gun either from the magazine by pulling the slide back, in the case of a pistol, and allowing the slide to go forward to feed the cartridge into the chamber or by pulling the slide back and manually loading a round into the chamber of the gun without a magazine being present.

[3] Wallace confirmed this, noting, "You can cock a gun without chambering a round; but, yes, you could use that term ['cocking'] to describe the process."

4

Scepanski." Investigator Garcia investigated appellant and found multiple residences associated with him. Investigators ultimately located appellant traveling in a vehicle with two friends and apprehended him. After being properly *Mirandized*, appellant provided Investigator Garcia with a statement.

In appellant's statement, appellant acknowledged shooting Villarreal, but appellant claimed it happened as he and Villarreal struggled for a handgun. According to appellant's statement, appellant had attended a party earlier that night, which his friend Rosa Perales hosted. Appellant said he left the party on foot and began walking home when a man named Rex, driving a black truck, stopped appellant and asked if appellant "had anymore weed to make money." Appellant responded he did not and asked Rex where appellant could get some Xanax "because a guy that I know as Balla [Villarreal] wanted to buy some." Rex said he knew where appellant could get some Xanax, and appellant called Villarreal. The following excerpt is from appellant's statement:

> I was on the phone with Balla and he was giving me directions to his house. Rex was driving his truck. Balla[] told me that he was going to be standing outside his property . . . . We pull up on the roadway facing south. Balla goes up to my window which is the passenger window and asked me for some Xanax Bars. I asked Rex for the bars and he say's [sic] he's not here yet, referring to the guy who was suppose[d] to bring them. Rex [] says will be right back and goes south about 3 blocks and turns around and pass Balla's house. We pull up again and face south. Balla comes to my window and this time I see he has a black pistol in the front of his waist. I can see the pistol because his zip up hoodie (sweater) is opened showing off his gun. Balla has his right hand near his waist line. When he gets to my window everything happens. Balla pulls out his pistol slow enough that I can hear a cock. I hear Rex say he's got a gun. I turn and see Balla pointing his gun at me. I know there a [sic] gun between Rex and I and I picked it up. I did not know if it was loaded or not. Balla tries taking the gun that I have and we began to struggle while I am inside the truck during which time I shoot Balla. I did not know where I had shot him. . . . I see Balla fall down on the spot and he gets back again. I see that Balla still

5

has his gun in his hand and I was afraid he was going to shoot so we took off. I got to see Balla walking into his property and I thought everything was good.

According to appellant's statement, Rex took appellant back to the party and left, taking the gun appellant had used with him. Appellant emphasized, "I did not mean to shoot Balla[;] it was in self[-]defense." Appellant also said he had never met Villarreal before that night and had only one conversation with him on the telephone. Pursuant to the State's motion, the trial court admitted appellant's statement into evidence.

Rosa Perales, who described herself as "a good friend" of appellant, hosted the party appellant attended on the night Villarreal was shot. Perales testified that appellant had informed her that he was going to Villarreal's house to sell Xanax bars. But appellant told Perales, "We didn't have any bars, we were going to play along until he showed us the money and then we were going to jack him up."

The gun used to shoot Villarreal was never recovered. Officers did find Rex's black GMC Sonoma pickup truck. On the outside of the passenger door, investigators recovered one particle characteristic of gunshot residue and two particles indicative of gunshot residue.[4] There was no gunshot residue on the inside of the door.

## II. LESSER-INCLUDED OFFENSE INSTRUCTION

By his first issue, appellant argues the trial court reversibly erred by denying his request to include the lesser-included offenses of manslaughter and criminally negligent homicide in the jury charge.

---

[4] Phillip Stout of the trace evidence section of the Texas Department of Public Safety Crime Laboratory explained that a characteristic particle has the "three component particles"—"lead, barium and antimony"—of gunshot residue, but an indicative particle has only two of the three elements.

6

## A. Applicable Law

The determination of whether the trial court should give a lesser-included offense instruction requested by a defendant requires a two-step analysis: "(1) Is the requested charge for a lesser-included offense of the charged offense? (2) Is there trial evidence that supports giving the instruction to the jury?" *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). We review the first step de novo. *See id.* Relevant here, the Texas Code of Criminal Procedure provides that an offense is a lesser-included if "it differs from the offense charged only in respect that a less culpable mental state suffices to establish its commission." TEX. CODE CRIM. PROC. ANN. art. 37.09(3) (West, Westlaw through 2013 3d C.S.).

In applying the second step, we look to see if there is some evidence in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Rice,* 333 S.W.3d at 145. "In applying the second prong of the test, the appellate court must examine the entire record instead of plucking certain evidence from the record and examining it in a vacuum." *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (en banc) (citing *Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993) (en banc)); *see Wesbrook v. State*, 29 S.W.3d 103, 113–14 (Tex. Crim. App. 2000) (en banc). "We consider all of the evidence admitted at trial, not just the evidence presented by the defendant." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011) (citing *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993) (en banc)).

7

"A defendant is entitled to an instruction on a lesser-included offense if some evidence from any source raises a fact issue on whether he is guilty of only the lesser, regardless of whether the evidence is weak, impeached, or contradicted." *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012) (citing *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985) (en banc)). The evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Id.* at 385; *Rice*, 333 S.W.3d at 145. "'[R]egardless of the strength or weakness of the evidence, if the evidence raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given.'" *Cavazos*, 382 S.W.3d at 384–85 (quoting *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (en banc)). "[W]e may not consider 'the credibility of the evidence and whether it conflicts with other evidence or is controverted.'" *Goad*, 354 S.W.3d. at 446–47 (quoting *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994) (en banc)). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser-included charge. *Id.* at 446. "The second step is a question of fact and is based on the evidence presented at trial." *Cavazos*, 382 S.W.3d at 383.

A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.[5] TEX. PENAL CODE ANN. § 6.03(a) (West, Westlaw through 2013 3d C.S.). A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person acts recklessly, or is

---

[5] Murder is a result-of-conduct offense, *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (en banc), and we therefore cite to the provisions of section 6.03 of the penal code that define mental states for result-oriented offenses.

reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* A person acts with criminal negligence, or is criminally negligent, with respect to the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the result will occur. *Id.* § 6.03(d). The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.*

**B.      Discussion**

**1.      Manslaughter and Criminally Negligent Homicide are Lesser-Included Offenses of Section 19.02(b)(1) Murder.**

In this case, manslaughter and negligent homicide are lesser-included offenses of murder, and the first prong of the test is satisfied. *See Rice*, 333 S.W.3d at 144. A grand jury indicted appellant for intentionally causing the death of Villarreal, a murder offense under Texas Penal Code section 19.02(b)(1). *See* TEX. PENAL CODE ANN. § 19.02(b)(1). The only difference between murder under section 19.02(b)(1) and manslaughter and criminally negligent homicide is that manslaughter has the lesser mental state of recklessness and criminally negligent homicide involves the lesser mental state of criminal negligence. *Compare id.*, *with* TEX. PENAL CODE ANN. § 19.04 (West, Westlaw through 2013 3d C.S.) (manslaughter), *and* TEX. PENAL CODE ANN. § 19.05 (West, Westlaw through 2013 3d C.S.) (criminally negligent homicide); *see* TEX. PENAL

9

CODE ANN. § 6.02(d) (West, Westlaw through 2013 3d C.S.) (outlining four culpable mental states "from highest to lowest"). Because manslaughter and criminally negligent homicide differ from murder in section 19.02(b)(1) only in that a less culpable mental state suffices to establish their commission, they are lesser-included offenses of section 19.02(b)(1) murder. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(3); *Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[I]t is well-established that manslaughter is a lesser-included offense of murder) (citing *Girdy v. State*, 213 S.W.3d 315, 318–19 (Tex. Crim. App. 2006); *Moore v. State*, 969 S.W.2d 4, 9 (Tex. Crim. App. 1998) (en banc))); *see also Saunders v. State*, 913 S.W.2d 564, 572 (Tex. Crim. App. 1995) (en banc) (holding negligent homicide is a lesser-included offense of murder).

### 2. The Evidence Supported an Instruction on Manslaughter.

Appellant's statement that he shot Villarreal in a struggle for a weapon was some evidence of recklessness. First, appellant's statement supported an inference he understood the risk associated with firearms, *see* TEX. PENAL CODE ANN. § 6.03(c) (defining recklessness); he explained that his decision to grab a gun was prompted by Villarreal allegedly pointing a gun at him. This indicated appellant appreciated the substantial risk the firearm posed. *See Sadler v. State*, 728 S.W.2d 829, 831 (Tex. App.—Dallas 1987, no pet.) (holding that the defendant's attempt to gain possession of a pistol because he was afraid the other person would use it to shoot him manifested an awareness "of the risk of injury or death involved in the ensuing struggle over the pistol"); *see also Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985) (en banc) (noting

10

that evidence showing a defendant's appreciation of a gun's potential for injury indicates the person is aware of a risk created by using it).

Second, appellant disregarded the risk by seizing the gun, but appellant's statement expressly disclaimed he intended to shoot. Instead, appellant said the shooting occurred while he and Villarreal struggled for the gun. This explanation is similar to one the court of criminal appeals concluded warranted a jury instruction on recklessness: "[A]ppellant testified that he did not intend to shoot the complainant and that the actual discharge of the gun was accidental, occurring during a struggle between appellant and the complainant. These are precisely the circumstances under which a charge on reckless conduct should be given." *Hayes v. State,* 728 S.W.2d 804, 810 (Tex. Crim. App. 1987) (op. on reh'g) (en banc). Following the *Hayes* holding, we conclude appellant's version of events constituted some evidence supporting an instruction on recklessness. *See Hayes*, 728 S.W.2d at 810; *Arnold*, 234 S.W.3d at 672 ("[C]ourts have typically found that a manslaughter instruction was required based on some evidence that the gun discharged accidentally or that the defendant only intended to frighten the complainant.").[6]

---

[6] We recognize appellant's statement arguably supports a self-defense claim, which is incompatible with recklessness. *See Alonzo v. State*, 353 S.W.3d 778, 782 (Tex. Crim. App. 2011). In his statement, appellant expressly uses the term self-defense: "I did not mean to shoot Balla[;] it was in self[-]defense." A review of appellant's whole statement, however, shows appellant does not use the term "self-defense" as a concession of intentional or knowing conduct he characterizes as justified; appellant is disavowing an intent to kill, insisting the gun discharged during a struggle—the quintessential situation involving recklessness. *See Hayes v. State,* 728 S.W.2d 804, 810 (Tex. Crim. App. 1987) (op. on reh'g) (en banc). Thus, although the jury charge included a self-defense instruction, it failed to provide the jury with the full array of options based on the trial evidence; the jury charge limited the jury to finding that appellant's conduct was either fully justified and warranted acquittal or unjustified as an intentional or knowing killing, omitting a potential finding that appellant's conduct was unjustified as reckless. The inclusion of a manslaughter instruction would not have precluded the self-defense instruction, *Alonzo*, 353 S.W.3d at 781–82, allowing the jury to decide whether appellant's act was justified or unjustified as reckless.

Third, the assertions in appellant's statement are not so isolated that only a review of them in a vacuum supports the lesser-included instruction. The State compares appellant's statement to the *Cavazos* defendant's denial of intent, which the court of criminal appeals held insufficient for a manslaughter instruction. *See Cavazos*, 382 S.W.3d at 385. The *Cavazos* ruling turned on the specific facts of that case: "Pulling out a gun, pointing at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that appellant acted recklessly at the moment he fired the shots." *Id.* Unlike the *Cavazos* defendant, appellant's statement did not present a version of events that was incompatible with all the evidence. There were no trial witnesses who witnessed the shooting. As is often the case, the fact finder had to infer appellant's mental state from the evidence. Most of the evidence simply proved a shooting occurred without shedding light on the circumstances of the shooting. Appellant never contested shooting Villarreal. Thus, gunshot residue on the passenger door of Rex's truck, appellant's phone number on Villarreal's cellular telephone, a shell casing at the scene of the shooting, and even Villarreal's statements that appellant shot him are pieces of evidence that supported a shooting done recklessly, intentionally, or knowingly. None of that evidence was inconsistent with appellant's statement. Appellant's mental state at the time of the shooting had to be gleaned primarily from Villarreal's words to the responding officers or appellant's statement—the two competing versions of events, neither of which were perfect.[7]

---

[7] The incompleteness of appellant's statement has already been discussed. Testimony of Villarreal's statements to the responding officers also contained gaps. For example, both officers claimed

In appellant's statement, appellant alleged he heard Villarreal cock his gun. Police officers found Villarreal's gun with a bullet chambered, i.e. the gun had been cocked, and Guerra, who had retrieved the gun from the road, insisted at trial that she did not cock the gun. This evidence arguably supported appellant's version; it certainly did not undermine appellant's statement. Appellant said Villarreal stood up and walked into his property after the shooting, which Guerra's testimony and Villarreal's position confirm.

This is not to say appellant's version of events was without competition. Contrary to appellant's characterization of simply responding to an unexpected threat, Deputy Contreras and Sergeant Davila testified Villarreal told them appellant demanded his money before shooting him, and Perales testified appellant told her before going to meet Villarreal he planned to "jack him up." Our inquiry, however, does not consider the credibility of appellant's statement or whether other evidence controverts it; anything more than a scintilla of evidence, regardless of however weak it is, entitles him to a lesser-included charge. *See Cavazos*, 382 S.W.3d at 384–85; *Goad*, 354 S.W.3d at 446–47. We hold appellant's statement satisfies that low threshold.

In reviewing the entire record, we also note that defense counsel relied heavily on appellant's statement during closing argument.[8] Defense had no opening argument, and

Villarreal called appellant a friend, but Guerra testified she never heard of appellant, and she noted Villarreal only carried his gun to drug transactions at which Villarreal did not know the buyer. Appellant's statement comported with Guerra's testimony; appellant stated "I never have met with Balla[,] we only had a conversation on the phone." More importantly, testimony that Villarreal said appellant demanded Villarreal's money was the main evidence supporting an intentional or knowing killing or killing in the course of a robbery, but, contrary to the purposes of a robbery, officers found a "stack" of currency near Villarreal, which was not where Villarreal, according to any statement or evidence, was shot. Appellant did not enter Villarreal's house, and there was no evidence he took any of Villarreal's personal property.

[8] For example, the following excerpt is from defense counsel's closing argument:

13

appellant did not testify, making defense counsel's closing argument the only time the jury heard the defense's narrative. Based on defense counsel's reliance on the statement and the fact that the evidence can be construed to support appellant's statement, the statement is not the type of evidence that only supports the lesser-included offense if plucked from the record and reviewed in a vacuum. *Cf. Cavazos*, 382 S.W.3d at 385–86; *Enriquez*, 21 S.W.3d at 278.

## C. Harm

The erroneous refusal to give a requested instruction on a lesser-included offense is charge error subject to an *Almanza* harm analysis. *See Saunders*, 840 S.W.2d at 392; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc). Under that analysis, reversal is required if the error resulted in some harm to the accused, "some" meaning "any." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (en banc); *Almanza*, 686 S.W.2d at 171. The court of criminal appeals has "routinely found 'some' harm, and therefore reversed, when the trial court has failed to submit a lesser

---

We know that Mr. Scepanski saw [Villarreal's] hand on the gun and that he pulled it and cocked it.

At that time, he pointed the gun. Mr. Scepanski panicked, reached for the gun that he didn't even know was loaded or not loaded. And it happened in an instant. It wasn't a matter of like the prosecutor wants you to believe that—did he have time to think, did he have time to do that or this. It was reactionary. He was afraid. He was intimidated. He was fearful for his life, so he pulls the gun surprising Mr. Villarreal.

Mr. Villarreal is surprised that, oh, this person can defend himself, drops his own weapon to the ground, wrestles with Mr. Scepanski for the weapon that he is now pointing and trying to defend himself with, and the weapon goes off shooting Mr. Villarreal in the chest area.

We recognize but are unconcerned that defense counsel argued self-defense; the self-defense argument was reasonable because by the time of closing argument, the trial court had already foreclosed the jury's consideration of manslaughter by denying appellant's requested instruction.

14

included offense that was requested and raised by the evidence—at least where that failure left the jury with the sole option either to convict the defendant of the greater offense or acquit him." *Saunders*, 913 S.W.2d at 571. When, however, a trial court submits one lesser-included offense raised by the evidence but declines to submit another that the evidence also raised, as is the case here:

> the jury's options [are] not limited to conviction of the greater offense or acquittal. Under these circumstances the *Beck* [*v. Alabama*, 447 U.S. 625, 634 (1980)] risk that the jury will convict of the greater offense despite its reasonable doubt is not so apparent. There is an available compromise. It is at least arguable that a jury that believed the defendant committed an uncharged lesser included offense, but unwilling to acquit him of all wrongdoing, and therefore inclined to compromise, would opt for a lesser included offense that *was* submitted rather than convict him of the greater offense.

*Id.* at 572. In *Saunders*, because the jury convicted the defendant of the greater offense rather than under the lesser-included charge that the trial court had submitted, the *Saunders* court concluded that the error of not including the refused lesser-included offense was harmless. *Id.* ("That the jury here did *not* [opt for the submitted lesser-included offense] may thus indicate that the sort of 'harm' contemplated by *Beck* did not occur in this cause."), 574 ("[B]ecause the jury did not opt to convict appellant of involuntary manslaughter, failure to authorize conviction for negligent homicide was harmless under *Almanza* and *Arline*.").

Unlike the *Saunders* jury, the jury in this case convicted appellant of the submitted lesser-included offense. According to the jury charge, the jury was to convict appellant of murder rather than capital murder if it had reasonable doubt appellant intentionally caused Villarreal's death or had reasonable doubt the killing occurred during the course

15

of a robbery.  We cannot tell by the jury's verdict of murder rather than capital murder whether it had reasonable doubt appellant acted intentionally, was committing a robbery, or both.  Because the jury returned a verdict on the submitted lesser-included offense, the "*Beck* risk" re-emerges, and it is not apparent, as it was in *Saunders*, that the jury would have disregarded the requested lesser-included offense.  The absence of appellant's requested manslaughter instruction left the jury with the sole option of convicting him of murder or acquitting him, either under self-defense or evidentiary concerns.  In such circumstances, the finding of harm is essentially automatic because the jury was denied the opportunity to convict the defendant of the lesser offense.  *See id.* at 571; *Brock v. State*, 295 S.W.3d 45, 49 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

### 3.    The Evidence Did Not Support an Instruction on Criminally Negligent Homicide.

Although criminally negligent homicide is a lesser-included offense, there was no evidence, including appellant's statement, that appellant, in firing the weapon, was unaware of a substantial and unjustifiable risk.  *See* TEX. PENAL CODE ANN. § 6.03(d) (defining criminal negligence).  Because the evidence did not support an instruction on criminally negligent homicide, appellant was not entitled to the instruction.  *See Rice,* 333 S.W.3d at 145.

### D.    Summary

Anything more than a scintilla of evidence supporting a lesser-included instruction entitles a defendant to the instruction, regardless of whether the evidence is weak, impeached, or contradicted.  *See Cavazos*, 382 S.W.3d at 383; *Goad*, 354 S.W.3d at

16

446–47.   Here, appellant's statement, on which the defense heavily relied, was sufficient evidence to meet the low threshold, and the trial court's error of not including the instruction harmed appellant.   Accordingly, we sustain appellant's first issue.   Having sustained the issue, we need not address appellant's other issues on appeal.   *See* TEX. R. APP. P. 47.1.

## III.   CONCLUSION

We reverse the trial court's judgment and remand the case to the trial court.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 21st
day of August, 2014.